**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0147n.06
Filed: February 19, 2009

Nos. 05-4063, 06-3462, 06-3499, 06-3750

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) | |
| | ) | |
| YOSEF A. ABDELSALAM, | ) | |
| | ) | |
| AMJAD SALEM, et al., | ) | |
| | ) | |
| YAHIA ALCHARBAJI, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FETHI YOUNES, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

Before: COLE, GIBBONS, and ROGERS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge**. These consolidated appeals by four criminal defendants arise out of their convictions for various offenses related to their involvement in a large operation that transported, repackaged, and sold stolen property. The center of the repackage and sales effort was Dayton, Ohio, and the goods moved from Dayton to other states. On appeal, Yahia Alcharbaji and Fethi Younes challenge the denial of their motion for mistrial. Yosef Abdelsalam,

Amjad Salem, and Younes also appeal their sentences, and Salem appeals the imposition of forfeiture money judgments.

For the reasons set forth below, we affirm the district court's denial of the motion for a mistrial by Younes and Alcharbaji and affirm the sentences of Younes and Abdelsalam. We vacate Salem's sentence and remand for resentencing. We affirm the $36,046.30 forfeiture money judgment against Salem but vacate the $2,633,802.50 money judgment against him and remand with instructions.

## I.

In early 2002, a task force of the Ohio Organized Crime Investigations Commission ("OOCIC") began an investigation into a criminal organization believed to be engaged in a massive stolen property fencing operation based in convenience stores in Dayton. The fenced stolen merchandise included food stamps, baby formula, diabetic blood glucose strips, Nicoderm patches, Nicorette gum, assorted over-the-counter medication, health and beauty items, food, and clothing. The organization cleaned, repackaged, resold, and transported this merchandise. It transported stolen merchandise from the Southern District of Ohio to other states including Indiana, Illinois, Kentucky, Michigan, Wisconsin, New York, and Florida.

The OOCIC completed approximately 288 undercover transactions during its investigation of the organization. On January 22, 2004, the OOCIC simultaneously executed seventeen search warrants, fifteen bank seizure warrants, and twenty arrests at multiple locations in Ohio, Kentucky, and Florida. Three of the warrants were executed at Rick's Grocery Store, Dayton, Ohio; Midwest Distributors, a/k/a Business Center Sales, Dayton, Ohio; and Linden Stop-N-Lock Storage Unit A-4,

Dayton, Ohio. A search warrant also was executed at Salem's residence located at 2734 Rockledge Trail, Beavercreek, Ohio.

Salem was self-employed and owned Midwest Distributors, a/k/a Business Center Sales. Salem also held a lease interest in Linden Stop-N-Lock Storage Unit A-4. Younes was the proprietor of Rick's Grocery Store. Items were seized from each of these locations during execution of the search warrants.

Alcharbaji was the proprietor of One Stop Wash and Shop, Dayton, Ohio. Abdelsalam was employed by Salem and worked at a warehouse operated by the organization where price tags, store markings, and security stickers were removed or "cleaned" from stolen retail merchandise in a production line.

On January 28, 2004, as a result of the OOCIC investigation, a grand jury returned a fifty-two count indictment (the "stolen property indictment") against twenty defendants including the four appellants. The indictment charged Salem with one count of conspiracy in violation of 18 U.S.C. § 371, nine counts of interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314 and 2, six counts of receipt and possession of interstate stolen property in violation of 18 U.S.C. § 2315, and eleven counts of unauthorized possession of federal food stamp access devices in violation of 7 U.S.C. § 2024(b). The indictment charged Abdelsalam with one count of conspiracy in violation of 18 U.S.C. § 371 and one count of interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314 and 2. The indictment charged Younes and Alcharbaji with one count each of conspiracy in violation of 18 U.S.C. § 371. The indictment also sought forfeiture of illegally

obtained proceeds under 7 U.S.C. § 2024(h) and 18 U.S.C. § 981(a)(1)(C) and substitute assets under 18 U.S.C. § 982(a)(6)(B) and 21 U.S.C. § 853(p).

On March 24, 2004, a grand jury returned a sixty-two count indictment (the "money laundering indictment") against Salem, Abdelsalam, and another defendant, alleging money laundering offenses associated with the stolen property operation. Abdelsalam was charged with one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(h). Salem was charged with one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(h), thirty-three counts of money laundering in violation of 18 U.S.C. §§ 1957 and 2, one count of conspiracy to evade reporting requirements in violation of 18 U.S.C. § 371, and twenty-seven counts of structuring to evade reporting requirements in violation of 31 U.S.C. § 5324(a)(1) and 18 U.S.C. § 2. The indictment also sought forfeiture of property traceable to offenses pursuant to 18 U.S.C. § 982(a)(1) and 31 U.S.C. § 5317(c)(1) and substitute assets pursuant to 18 U.S.C. §§ 982(a)(1) and 982(a)(6)(B) and 21 U.S.C. § 853(p). On May 4, 2004, the two cases were consolidated.

A.      *Yosef Abdelsalam*

On April 22, 2005, Abdelsalam entered a guilty plea to the conspiracy count of the stolen property indictment, count 1, pursuant to a written plea agreement. The plea agreement stated, "The parties further agree that the offenses involved receiving stolen property and the Defendant was involved in the business of receiving stolen property, resulting in a two level increase pursuant to § 2B1.1(b)(4)." The factual basis for the plea agreement stated that the offenses involved stolen merchandise and stated that Abdelsalam was a "low-level assistant, and laborer" in the organization

who unloaded, sorted, and removed tags from stolen merchandise. The plea agreement further stated, "The parties understand that the conspiracy charge involved 50 or more total victims resulting in a four level increase pursuant to § 2B1.1(b)(2)(B)."

The pre-sentence report ("PSR") for Abdelsalam calculated an offense level of 17 and a criminal history category of I. The PSR began with a base offense level of six and added eight points for a loss of between $70,000 and $120,000, four points for between 50 and 250 victims, and two points because Abdelsalam participated in a business activity involving the transportation of stolen goods and the repackaging of stolen goods. The PSR subtracted three points for acceptance of responsibility. It computed the advisory Guidelines range as 24 to 30 months. The PSR stated, "Based upon the defendant's role as an employee at the warehouse, the number of consumers his behavior impacted is unknown. As such, agents and the government estimated based upon the amount purchased by the defendant that his behavior impacted between 50 and 250 consumers." Abdelsalam initially did not object to the PSR but later filed a sentencing memorandum with objections. The district court agreed with the PSR's Guidelines calculation.

At his sentencing hearing, Abdelsalam's cultural background, family history, and family situation were discussed. Abdelsalam's counsel recounted his background and upbringing, including that he had been raised in a different culture, that he was a recent immigrant to America, and that he was eighteen at the time he participated in the criminal organization. His counsel argued that imprisonment was unnecessary because of Abdelsalam's "particular characteristics" and respect for the law. Following counsel's argument, the district court stated, "The Court understands the age of this young man and the Court however does not believe that he lacks necessarily sophistication with

regard to what was occurring. It occurred for a significant period of time." The district court sentenced Abdelsalam to imprisonment for 24 months, a $100 special assessment, and two years supervised release. Abdelsalam filed a timely notice of appeal.

B.    *Amjad Salem*

On August 15, 2005, Salem entered a guilty plea pursuant to a written plea agreement. He pled guilty to the following counts in the stolen property indictment: count 1 (conspiracy); count 2 (interstate transportation of stolen property); count 3 (receipt and possession of interstate stolen property); and count 23 (unauthorized possession of federal food stamp access devices). He also pled guilty to count 1 in the money laundering indictment, conspiracy to launder money. The plea agreement stated, "The defendant understands that the Probation Department will conduct an advisory pre-sentence investigation and will recommend to the Court a sentencing guideline range. The defendant understands that the Probation Department's recommendations are not binding on the Court and the terms of this Plea Agreement are not binding upon the Court or Probation Department."

Salem's PSR calculated an offense level of 38 with a criminal history category of III. The PSR started with a base offense level of seven and added eighteen points for a loss more than $2,500,000, six points for more than 250 victims, two points because the offense involved receiving stolen property and Salem was in the business of receiving and selling stolen property, two points because Salem participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement, two points for a conviction under 18 U.S.C. § 1956, and four points because

transactions to evade reporting were made at different branches.  The report subtracted two points for acceptance of responsibility and one point because Salem provided timely notification of his intent to plead guilty.  It found the Guidelines sentencing range was 292 to 365 months.  Defense counsel objected to portions of the PSR including the "amount of loss, role in the offense, criminal history and any recommendation regarding upward departure or consecutive sentence time."

The district court conducted an evidentiary hearing to resolve Salem's objections.  The government presented testimony from two co-defendants, Awwad Oweida and Fadi Mardini, and five OOCIC agents, Dean Blair, Daniel Osterfeld, Michael Gabrielson, Roger Hoff, and Mark Barnhart.  At the hearing, Oweida indicated that Salem was his boss in the conspiracy.  Furthermore, Mardini, stated that Salem controlled the organization.  Barnhart testified Salem was the "boss" in the conspiracy, received the largest profits, and controlled the key decisions.  According to Barnhart, Salem recruited persons to join the organization.  Barnhart also testified that Salem purchased purportedly stolen property on forty-nine occasions from undercover agents and that these purchases had a retail value of $343,000.00.  He further testified there were a total of 288 undercover transactions from Salem's co-conspirators that had a retail value of about $618,000.00.  He speculated that there were "hundreds if not thousands" of total victims.  The government calculated the fair market retail value of products sold to the conspiracy was $1,078,123.83.  It also examined five bank accounts that were part of the organization and concluded the total loss was $2,633,802.50.  Salem did not offer evidence at the hearing.

In calculating Salem's offense level, the district court started with an offense level of seven.  It found that the amount of loss was between $1,000,000.00 and $2,500,000.00 and enhanced the

sentence by sixteen points for this amount of loss. Additionally, the district court enhanced the sentence by four points because the offense involved 50 and 250 victims and by four levels because Salem had a controlling and aggravating role in the money laundering scheme. Ultimately arriving at an offense level of 34 and a criminal history category of III, it found that the Guidelines range was 188 to 235 months. The district court sentenced Salem to 132 months imprisonment, a $500 special assessment, and 3 years supervised release.

The United States filed a civil forfeiture action against all property referenced in both of the indictments. The district court granted a default judgment and decree of forfeiture in the civil forfeiture action. The district court entered forfeiture money judgments against Salem in the amounts of $2,633,802.50 and $36,046.30. Salem timely filed a notice of appeal.

C.      *Yahia Alcharbaji and Fethi Younes*

On October 11, 2005, the joint jury trial of Younes and Alcharbaji began. During trial both defendants moved for a mistrial based on testimony by Barnhart about a Cincinnati/Kentucky investigation. The district court denied the motion. Both Alcharbaji and Younes were convicted of the conspiracy count of the stolen property indictment.

The district court sentenced Alcharbaji to 24 months imprisonment, a $100 special assessment, and two years of supervised release. It entered a money judgment of $11,369.74 for the United States. Alcharbaji filed a timely notice of appeal.

Younes's PSR calculated an offense level of 26 and a criminal history category of I. It started with a base offense level of six and added twelve points for loss in excess of $618,000, four points

for between 50 and 250 victims, two points because Younes personally participated in business activity involving receiving and selling stolen goods, and two points because Younes was an organizer, leader, or manager. The PSR calculated a Guidelines range of 63 to 78 months. Younes made several objections to the PSR including the calculation of the amount of loss and the number of victims and the determination that he was in the business of receiving stolen property.

The district court computed a Guidelines range of 41 to 51 months, from an offense level of 22 and a criminal history category of I, and sentenced Younes to 42 months imprisonment, a $100 special assessment, and two years of supervised release. It noted that it increased the offense level by two points because Younes was in the business of selling and receiving stolen property and also increased the offense level by another two points because Younes was a leader or manager. The district court used a criminal history category of I. The district court explained it had "considered all of the factors listed under 18 U.S.C. § 3553" and had "paid close attention and considered the nature and circumstances of this offense and the history and/or characteristics of the Defendant." It elaborated:

> Obviously the Defendant has no prior record. The Court has however become very familiar with the nature of the circumstances of this offense. The Court also has not ignored the category of need for sentence, a sentence to reflect the seriousness of the offense, to afford an adequate deterrence, and to protect the public from further crimes and to provide the Defendant with the necessary type of a sentence.
>
> The Court has considered the kinds of sentences available and the Court also has considered all of these things in light of the advisory guidelines.
>
> The Court in comparing Defendants with regard to dispositions, obviously there are many many factors to take into consideration there. There are factors that we are all aware of that are laid out in the advisory guidelines, those kind of computations.

> We are also aware of the fact that there are other types of motions, other types of factors that play into a sentence that a Defendant receives, those being 5K, 3553 motions that are brought to the court and ruled upon.
>
> The Court has considered all of these factors . . . .

Younes filed a timely notice of appeal.

II.

A.    *Denial of the Motion for a Mistrial by Alcharbaji and Younes*

Younes and Alcharbaji both argue that the district court abused its discretion in denying their motions for a mistrial. One of the witnesses called by the prosecution during the trial of Alcharbaji and Younes was Barnhart, a special agent with the Department of Agriculture's Office of Inspector General Investigation. During his testimony, Barnhart referred to a companion case "centered out of Cincinnati, Ohio."

During his testimony, the following exchange occurred:

> Q:    Now, at the outset of the task force when it first stood up back in January of '02, you were a member of the task force, is that correct?
>
> A.    Yes, sir.
>
> Q.    At that point did you – did the task force have any specific names of targets that they were looking at in the Dayton area?
>
> A.    No. We had intelligence information from the Kentucky investigation.
>
> Q.    Okay. So at that point is it fair to say that neither Mr. Younes or Mr. Alcharbaji were identified targets?
>
> A.    They were not.
>
> . . .
>
> Q.    Their names eventually did become known as targets, correct?

A.    Yes, sir.

Q.    Were you personally involved in the process that led to the identity of these two defendants as criminal targets?

A.    Yes, sir.

Q.    Describe if you could, your involvement, your knowledge in the process leading up from the start of the task force's business back in January of 2002 until you reached the point where these two individuals became targets. What were the steps, the investigative steps that were used in order to reach that point?

A.    Based on the information that we obtained during the Cincinnati Kentucky investigation we knew –

Mr. Rion.    Objection. Hearsay.

The Court.    My understanding is the question is what did he know.

Mr. Keller.    Yes.

Mr. Rion.    I don't know what he is going to say. But I assume that what he knows is what somebody told him, which would make it hearsay.

The Court.    I will accept the objection. But I'm overruling the objection. And it will be a continuing objection.

Q.    What did you know as the case agent as the case developed with respect to these two Defendants eventually becoming targets. How did you reach that point?

A.    I was the case agent in the Cincinnati/Lexington Kentucky investigation as well. I sat at the Government's table during their trial. They were later found guilty.

Mr. Rion.    Objection.

The Court.    Sustained.

Mr. Rion.    I'd ask the answer be stricken.

The Court.    It will be stricken. Ladies and gentlemen you should disregard that. That should play no part in your consideration.

11

Q.    Please describe the investigative steps.

A.    The investigation in Lexington, Cincinnati/Lexington showed that that target of investigation was issuing checks and also receiving property from the Dayton, Ohio area. Based on that information the task force 02-3 was established.

During the next break in proceedings, outside the presence of the jury, Alcharbaji's counsel made a motion for a mistrial, which was joined by Younes's counsel. The motion was based upon Barnhart's testimony that defendants in the Cincinnati/Lexington, Kentucky investigation were found guilty.[1] The district court took the motion under advisement. Counsel supplemented the motion for a mistrial outside the presence of the jury the following day, arguing that an audio cassette played for the jury referenced Younes's travel from Cincinnati to Dayton. During a subsequent conference outside the presence of the jury about the motion for a mistrial, counsel for Younes moved for severance from Alcharbaji. On the fifth day of trial, counsel for Younes, joined by counsel for Alcharbaji, renewed the motion for a mistrial, arguing that the prejudice from Barnhart's statement was exacerbated by subsequent references to the Cincinnati/Lexington, Kentucky investigation. The district court denied the motion for a mistrial, ruling from the bench that the motion was not "well founded."

While instructing the jury before deliberations, the district court gave the following instruction:

---

[1] Despite the ambiguity of the sentence "They were found guilty," defense counsel never claimed that the jury might think that "they" referred to Alcharbaji and Younes. Rather, the argument was that Alcharbaji and Younes were prejudiced by the reference to other individuals who had been found guilty of charges arising out of a distinct, but similar, investigation.

*United States v. Abdelsalam,* 05-4063

> Anything to which an objection has been sustained by the Court or anything that you may have seen or heard outside the courtroom is not evidence. These items must be entirely disregarded.

> Statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence. And likewise they must be treated as though you never heard them.

This court reviews the district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Martinez*, 430 F.3d 317, 336 (6th Cir. 2005). The court evaluates five factors in considering whether a mistrial should be granted following an improper reference: "(1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant." *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (citation omitted). "[A] determination of the fairness to the accused is the primary concern in ruling upon a mistrial motion." *United States v. Sherill*, 388 F.3d 535, 538 (6th Cir. 2004) (citation omitted) (alteration in original).

Younes argues that the government solicited the statement from Barnhart that the defendants in the case arising from the Cincinnati/Lexington, Kentucky investigation were convicted. The statement's context, however, clearly demonstrates that the government did not solicit it. The previous questions were about how the investigation of Younes and Alcharbaji began – both generally and specifically. Barnhart's answer, which focused on another trial and defendants other than Alcharbaji and Younes, was largely non-responsive to the question. Furthermore, this line of questioning was reasonable, as questions relating to how an agent began an investigation are relevant and provide background and contextual information.

13

*United States v. Abdelsalam,* 05-4063

Younes next contends that the district court's limiting instruction was not sufficiently clear and forceful. This argument, however, is belied by the trial transcript. Immediately following the statement, the district court ordered the statement stricken and instructed the jury, "Ladies and gentlemen you should disregard that. That should play no part in your consideration." In *United States v. Forrest*, a government witness "blurted out" that the defendant had been paroled from state prison five months earlier. 17 F.3d 916, 920 (6th Cir. 1994). The district court instructed the jury, "Ladies and gentlemen of the jury, I am going to instruct you to disregard that comment and not consider it for any purpose." *Id*. at 920 n.2. This court, reviewing the district court, explained that the instruction was "clear and immediate after the agent's initial 'blurted' statement." *Id.* at 920. Similarly, the instruction here was immediate, clear, and forceful. As an additional curative measure, during final jury instructions, the district court gave an additional instruction to disregard statements that were stricken and to treat the statements as if they were never heard. Moreover, a jury is "presumed to understand and follow such directions from the court." *Id.* at 920-21. Neither defendant argues, and there is no evidence, that the government acted in bad faith in producing the statement.

Younes argues that the remark "played no small part in the evidence" against him because Barnhart was the agent in charge of the investigation and the first witness called by the government. Similarly, Alcharbaji argues that the statement was important. In fact, the statement was only a small part of the evidence against Younes and Alcharbaji. The government presented testimony from several convicted co-defendants, Awwad Oweida, Fadi Mardini, and Jamal Hussein. It presented the testimony of undercover task force members Diane Corey, Byron Guinther, and Dennis Castle;

14

these agents conducted numerous undercover transactions with both Younes and Alcharbaji. The government introduced testimony from additional task force members and from confidential informants Beverly Williams and Kelly Ring. The government introduced exhibits including stolen property, the organization's financial records, and undercover audio and videotape recordings of telephone conversations and controlled transactions. This plethora of evidence demonstrates that Barnhart's statement represented only a small portion of the evidence against Younes and Alcharbaji.

Younes and Alcharbaji both argue that they were denied a fair trial because Barnhart's statement was so prejudicial. Given the above analysis, Younes and Alcharbaji the district court did not abuse its discretion in denying the motion for a mistrial. *See, e.g.*, *Zerka v. Green*, 49 F.3d 1181, 1187 (6th Cir. 1995) ("[A litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials." (citation omitted)).

We affirm the district court's denial of the motions for a mistrial by Younes and Alcharbaji.

B.      *Procedural and Substantive Reasonableness of the Sentences Imposed Upon Younes, Abdelsalam, and Salem*

An appellate court reviews a district court's sentence to determine if it is unreasonable. *United States v. Booker*, 543 U.S. 220, 261 (2005). Following *Booker*, this court generally applies an abuse of discretion standard to sentencing decisions. *Gall v. United States*, 128 S. Ct. 586, 594 (2007); *see also Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) (stating that appellate courts review the reasonableness of a district court's sentence for an abuse of discretion).

*United States v. Abdelsalam,* 05-4063

If a defendant does not object to his sentence in the district court after the district court asks if he has any objections, this court reviews his challenge to it for plain error. *United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008.) (en banc) (applying *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004)); *see also United States v. Alexander*, 517 F.3d 887, 889 (6th Cir. 2008). Plain error is "(1) error (2) that was obvious or clear (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *Vonner*, 516 F.3d at 386 (internal quotations omitted).

This court "first ensure[s] that the district court committed no significant procedural error," and next "consider[s] the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 128 S. Ct. at 597; *see also United States v. Smith*, 516 F.3d 473, 476 (6th Cir. 2008).

A sentence is procedurally unreasonable if the court committed serious procedural error "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence–including an explanation for any deviation from the Guidelines range." *Gall*, 128 U.S. at 597. When reviewing for substantive reasonableness, if a sentence falls within the Guidelines range, we "apply a presumption of reasonableness." *United States v. Wittingen*, 519 F.3d 633, 637 (6th Cir. 2008) (citation omitted). "A reviewing court will find that a sentence is substantively *unreasonable* where the district court select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors, or giv[es] an unreasonable amount of weight to any pertinent factor."

16

*United States v. Abdelsalam,* 05-4063

*United States v. Tate*,  516 F.3d 459, 469 (6th Cir. 2008) (citation and internal quotation marks omitted).

1.     *Younes*

Younes argues that his sentence was unreasonable in light of the factors set forth in 18 U.S.C. § 3553(a), specifically 18 U.S.C. § 3553(a)(6), because the district court "created  unwarranted sentence disparities among the defendants in this case with similar records who have been found guilty of similar conduct" and the district court did not adequately explain its decision.

Younes's sentence is not procedurally unreasonable.  The district court examined the factors set forth in 18 U.S.C. § 3553(a), noted that the Guidelines were not mandatory, and adequately explained the reasons for the chosen sentence. *See Gall*, 128 S. Ct. at 597.  The district court "paid close attention and considered the nature and circumstances of this offense and the history and/or characteristics of the Defendant."  The district court specifically examined 18 U.S.C. § 3553(a)(6), noting that in comparing the sentences, it considered "many many factors," including the advisory Guidelines and motions for downward departures for substantial assistance and acceptance of responsibility ruled upon by the court.  Younes argues this explanation is insufficient.  From the record, however, it is clear that the district court considered 18 U.S.C. § 3553(a)(6) and explained the "basis for rejecting it." *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006).

Applying a presumption of reasonableness to this within-Guidelines sentence, Younes's sentence is not substantively unreasonable. *See Wittingen*, 519 F.3d at 637.  While a "district court may consider disparity in the sentencing of codefendants . . . a departure intended to achieve

17

uniformity . . . is not appropriate when a basis for the disparity exists." *United States v. Walls*, 293 F.3d 959, 969 (6th Cir. 2002). Younes has not rebutted this presumption. He does not argue about his sentence at all but instead criticizes the Guidelines for the sentences given to other defendants. Younes bases his argument on the number of counts of conviction for each defendant, the length of each defendant's sentence, and the length of each defendant's probation. However, he does not discuss factors contributing to his co-defendants' sentences, such as an early plea, acceptance of responsibility, or substantial assistance. Here, Younes went to trial while many of his co-defendants did not, and he did not receive credit for substantial assistance or acceptance of responsibility, unlike many of his co-defendants.

Because we conclude that Younes's sentence was reasonable, we affirm it.

2. *Abdelsalam*

Abdelsalam argues that the district court (1) failed to take his cultural background and upbringing into account, (2) failed to properly consider the possibility of no need for imprisonment, (3) failed to consider a downward departure for family ties and responsibilities under U.S.S.G. § 5H1.6, (4) lacked a sufficient factual basis to apply a two-level enhancement under U.S.S.G. § 2B1.1(b)(4) for being a person in the business of receiving and selling stolen property, and (5) lacked a sufficient factual basis to apply a four-level enhancement under U.S.S.G. § 2B1(b)(2)(B) for involvement in an offense with more than 50 victims.

Initially, we note that Abdelsalam's argument that the district court failed to take his cultural background and upbringing into account and failed to consider the possibility of a sentence without

imprisonment is not supported by the record. Abdelsalam's counsel recounted his background and upbringing, including that he had been raised in a different culture, that he was a recent immigrant to America, and that he was eighteen at the time he participated in the criminal organization. His counsel also argued that imprisonment was unnecessary because of Abdelsalam's "particular characteristics" and respect for the law. The district court explicitly considered these arguments, explaining, "The Court understands the age of this young man and the Court however does not believe that he lacks necessarily sophistication with regard to what was occurring. It occurred for a significant period of time."

The argument that the district court should have given Abdelsalam a downward departure for family ties and responsibilities under U.S.S.G. § 5H1.6 also fails. This court does not "review decisions of a district court not to depart downward 'unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure.'" *United States v. Puckett*, 422 F.3d 340, 345 (6th Cir. 2005) (citing *United States v. Stewart*, 306 F.3d 295, 329 (6th Cir. 2002)). The transcript of the sentencing hearing contains no indication that the district court was unaware it could depart downward. Thus, the argument is not subject to this court's review.[2]

Abdelsalam's argument that the district court lacked a sufficient factual basis to apply a two-level enhancement under U.S.S.G. § 2B1.1(b)(4) for being a person in the business of receiving and selling stolen property lacks merit. His plea agreement stated, "The parties further agree that the

---

[2]Furthermore, we note that U.S.S.G. § 5H1.6 states, in relevant part, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." *See United States v. Lozano-Alvarez*, 226 F. App'x 531, 534 (6th Cir. 2007). Like the Guidelines, policy statements like this remain advisory in nature.

offenses involved receiving stolen property and the Defendant was involved in the business of receiving stolen property, resulting in a two level increase pursuant to § 2B1.1(b)(4)." The factual basis for the guilty plea, which Abdelsalam agreed was accurate, stated that the offenses involved stolen merchandise and explained that Abdelsalam's role was that of "low-level assistant, and laborer," who unloaded, sorted, and removed tags from stolen merchandise for other members of the conspiracy. Thus, the factual basis for the plea provided facts that support the application of the enhancement. Furthermore, that Abdelsalam stipulated to the application of the enhancement in his plea agreement likely prevents his challenge on appeal. *See United States v. Bazzi*, 94 F.3d 1025, 1028 (6th Cir. 1995) (holding that defendants waived their right to appeal an enhancement to their sentences when their plea agreements contained sentencing calculations including the enhancement).

Abdelsalam's argument that the district court lacked a sufficient factual basis to apply a four-level enhancement under U.S.S.G. § 2B1(b)(2)(B) for involvement in an offense with more than 50 victims also fails. He argues that application of the enhancement violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), because "it was not based on facts admitted by him or proven beyond a reasonable doubt by a jury." The PSR stated, "Based upon the defendant's role as an employee at the warehouse, the number of consumers his behavior impacted is unknown. As such, agents and the government estimated based upon the amount purchased by the defendant that his behavior impacted between 50 and 250 consumers." Abdelsalam failed to produce evidence calling into question these facts and thus his argument does not succeed. *See United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003) ("[a] defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce

some evidence that calls the reliability or correctness of the alleged facts into question. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR." (citation omitted)). Moreover, the Supreme Court recently stated that its "Sixth Amendment cases do not automatically forbid a sentencing court to take account of factual matters not determined by a jury and to increase the sentence in consequence." *Rita*, 137 S. Ct. at 2465-66.

A challenge to the district court's estimation of the total number of victims also fails. This factual finding is evaluated for clear error. *United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir. 1990) (holding that an estimation of the amount of drugs attributable to one defendant was not clear error). The plea agreement stated that Abdelsalam's sentence would be enhanced for this number of victims, and the PSR explained that the estimation was based upon his criminal acts. The district court did not clearly err in this estimation.

Applying the presumption of reasonableness, Abdelsalam's sentence is both procedurally and substantively reasonable. The district court considered the 18 U.S.C. § 3553(a) factors and sentenced Abdelsalam to 24 months, a sentence at the low end of his Guidelines range. We thus conclude that Abdelsalam's sentence was reasonable.

3.      *Salem*

Salem challenges, for the first time on appeal, four components of the advisory Guidelines calculation that resulted in an offense level of 34. He argues that the district court committed plain

error in using a base offense level of seven, computing the amount of loss, and in determining the

total number of victims and that Salem was an organizer or leader of the money laundering scheme.

a.    *Calculation of the Base Offense Level*

Salem argues that the district court plainly erred in using a base offense level of seven, rather

than six.  In this argument he is correct.

Salem first argues that the use of an offense level of six in the plea agreement should prevent

the district court from using a base offense level of seven.  To be sure, the plea agreement used a

base offense level of six, not seven.  By the terms of the plea agreement, however, these calculations

were binding on neither the district court nor probation, and both could calculate different base

offense levels.[3]

Salem also argues that the base offense level should be six, rather than seven, on the merits.

The money laundering count is brought under 18 U.S.C. § 1956(h), which is sentenced under

U.S.S.G. § 2S1.1.  When calculating the base offense level for a count of money laundering, the

court must determine the underlying offense from which the laundered funds were derived and

whether the defendant committed the underlying offense.  The underlying offense here is receipt of

stolen property in violation of 18 U.S.C. § 2315.  *See* U.S.S.G. § 2S1.1(a)(1).  Appendix A to the

Sentencing Guidelines specifies that a sentence for money laundering with an underlying offense of

---

[3]The plea agreement stated, "The defendant understands that the Probation Department will conduct an advisory pre-sentence investigation and will recommend to the Court a sentencing guideline range.  The defendant understands that the Probation Department's recommendations are not binding on the Court and the terms of this Plea Agreement are not binding upon the Court or Probation Department."

22

receipt of stolen property is calculated under U.S.S.G. § 2B1.1. Pursuant to U.S.S.G. § 2B1.1(a)(1), the appropriate base offense level for money laundering is seven "if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more." Otherwise, the applicable base offense level is six. U.S.S.G. § 2B1.1(a)(2). Thus, the dispute concerns whether money laundering is "referenced to this guideline."

The commentary explains the meaning of "referenced to this guideline." It states, in relevant part, "For purposes of subsection (a)(1), an offense is 'referenced to this guideline' if (i) this guideline is the applicable Chapter Two guideline determined under the provisions of § 1B1.2 (Applicable Guidelines) for the offense of conviction . . ." U.S.S.G. § 2B1.1, application notes 2(A). According to Appendix A of the Sentencing Guidelines, 18 U.S.C. § 2315, receipt of stolen property, is an offense referenced to this guideline. The base offense level is six because the offense of conviction, although it has a maximum term of twenty years, is not "referenced to" § 2B1.1. Thus, § 2B1.1(a)(2) would apply. Salem was convicted of money laundering, which is an offense referenced to § 2S1.1, and not (or only indirectly) to § 2B1.1. If indirectly referenced offenses of conviction were included in § 2B1.1(a)(1)(A), then subsection (A) would be surplusage, without independent meaning. Thus, the district court committed error that was plain. Because the district court used the wrong base offense level in computing Salem's sentence, the error affected substantial rights and the fairness of the sentencing hearing. Furthermore, at oral argument, the government conceded that the base offense level should be six, rather than seven. We reverse Salem's sentence and remand for resentencing using a base offense level of six, rather than seven.

b.　　*Amount of Loss*

Salem challenges the district court's finding on the amount of loss as clearly erroneous, arguing the loss figures presented at the evidentiary hearing were inflated and not supported by sufficient evidence.  As previously noted, *see* page 7 *supra*, the district court held an evidentiary hearing regarding sentencing issues in Salem's case and found that the amount of loss was between $1,000,000.00 and $2,500,000.00 and enhanced the sentence by 16 points for this amount of loss. At the hearing, the government presented two different methods for calculating the loss.  First, it calculated the fair market retail value of products sold to the conspiracy as $1,078,123.83.  Secondly, it examined five bank accounts that were part of the organization and concluded the total loss was $2,633,802.50.  Salem did not offer any evidence.

We review the district court's loss calculation under the Sentencing Guidelines for clear error.  *United States v. Mickens*, 453 F.3d 668, 670 (6th Cir. 2006).  The government was required to prove the loss amount by a "preponderance of the evidence."  U.S.S.G. § 6A1.3 comment.  The offense conduct on which the amount could be based included

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.

U.S.S.G. § 1B1.3(a)(1)(A), (B).  "'Loss' means the value of the property taken, damaged, or destroyed.  Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue."  U.S.S.G. § 2B1.1 comment 2; *see also United States v. Moore*, 225

24

*United States v. Abdelsalam,* 05-4063

F.3d 637, 642 (6th Cir. 2000). The comments further explain, "For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based upon the approximate number of victims and the average loss to each victim, or on more general factors such as the scope and duration of the offense." *Id*. § 2B1.1 comment 3. "In challenging the court's loss calculation, [a defendant] must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations." *United States v. Hamilton*, 263 F.3d 645, 654 (6th Cir. 2001).

This court has created a methodology to determine loss. *Moore*, 225 F.3d at 642. "First, we determine whether a market value for the stolen property is readily ascertainable; second, if a market value is ascertainable, we determine whether that figure corresponds with the greater figure between the harm suffered by the victim and the gain realized by the defendant." *Id.* "Moreover, 'the price a willing buyer would pay a willing seller at the time and place the property was stolen or at any time during the receipt or concealment of stolen property' is the customary test for determining market value." *Id.* (citing *United States v. Warshawsky*, 20 F.3d 204, 213 (6th Cir. 1994)). The government's two methods of calculation utilize this approach, and the district court made a reasonable estimate of loss.

Salem attacks the loss calculations, arguing that the government's two methods of calculation were both flawed and that the government relied on calculations involving retail value when it should have relied, at least in part, upon calculations using wholesale value. Salem is correct that the record does not explain whether the property seized came from retail or wholesale locations.

25

*United States v. Abdelsalam,* 05-4063

Salem's attack on the intricacies of the calculations fails, however, because the loss calculation need not be precise and can be a reasonable estimate given the available information. *See* U.S.S.G. § 2B1.1 comment 3. The district court's loss calculation was reasonable and based upon the evidence presented at the hearing. The court did not commit error, clear or otherwise, in calculating the loss.

c.      *Enhancement for 50 to 250 Victims*

Salem argues the district court erred in applying a four-level enhancement for between 50 and 250 victims. He argues that insufficient evidence of the number of victims was presented. Barnhart testified that Salem purchased purported stolen property on 49 occasions from undercover agents and that these purchases had a retail value of $343,000.00. He also testified that there were a total of 288 undercover transactions from Salem's co-conspirators that had a retail value of about $618,000.00. He speculated that there were "hundreds if not thousands" of total victims. Based upon this evidence, the district court did not clearly err in estimating there were between 50 and 250 victims. *See United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir. 1990).

d.      *Enhancement for Being an Organizer or Leader*

The district court enhanced the sentence by four levels because Salem was an organizer or leader of the money laundering scheme, a finding that Salem challenges. Salem argues the four-level enhancement pursuant to U.S.S.G. § 3B1.1 is not warranted because the district court did not make a finding that the criminal activity involved five or more persons and there was insufficient evidence that Salem was an organizer or leader. At an evidentiary hearing, the testimony of Awwad Oweida,

a co-defendant, indicated that Salem was his boss in the conspiracy. Furthermore, another co-defendant, Fadi Mardini, testified that Salem controlled the organization. Agent Barnhart testified Salem was the "boss" in the conspiracy, received the largest profits, and controlled the key decisions. Salem recruited multiple persons to join the organization. The conspiracy resulted in the indictment of 19 other persons. Given this evidence, the district court correctly determined that Salem was an organizer or leader of the money laundering scheme involving five or more persons.

C.      *The Forfeiture and Money Judgments Imposed Upon Defendant Salem*

This court reviews the district court's interpretation of federal forfeiture laws *de novo*. *United States v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007). The government has the burden to prove forfeiture by a preponderance of the evidence. *Id.* "Findings of fact are reviewed for clear error. The issue of whether those facts are sufficient to constitute a proper criminal forfeiture is reviewed de novo." *Id.* (citing *United States v. O'Dell*, 247 F.3d 655, 679 (6th Cir. 2001)).

Salem presents several arguments as to why the forfeiture money judgments in the amounts of $2,633,802.50 and $36,046.30 are not reasonable. He argues (1) the evidence was insufficient to establish he possessed assets sufficient to trigger the statutory "substitute assets" provisions of forfeiture laws, (2) the $2,633,802.50 money judgment is clearly erroneous, and (3) the district erred by failing to rule whether the money seized from Salem's residence should be criminally forfeited and failed to order the return of certain jewelry as the parties had agreed.

Salem argues that the evidence was insufficient to establish that he possessed assets sufficient to trigger the statutory "substitute assets" provisions of forfeiture laws, which renders the money

judgments invalid. A forfeiture action can take the form of a money judgment, forfeiture of specific assets, or forfeiture of substitute assets. *United States v. Candelaria-Silva*, 166 F.3d 19, 42 (1st Cir. 1999) (citation omitted); 21 U.S.C. § 853(p)(1). A statute provides for forfeiture following a conviction in violation of 18 U.S.C. § 1956, one of the counts to which Salem pled guilty. *See* 18 U.S.C. 982(a)(1) ("The court, in imposing sentence on a person convicted of an offense in violation of section 1956 . . . of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.") We agree with the First and Third Circuits that an in personam money judgment is authorized under the forfeiture statute. However, we also agree with those circuits that, because any future assets Salem obtains to satisfy such a money judgment will necessarily be substitute assets, the government must comply with the requirements of Section 853(p)(1). *See Candelaria-Silva*, 166 F.3d at 42; *United States v. Voigt*, 89 F.3d 1050, 1084-88 (3d Cir. 1996).

Salem argues the $2,633,802.50 money judgment, the amount of one of the loss calculations presented at the evidentiary hearing, is clearly erroneous and was not based on sufficient evidence. In its brief the government states, "The United States concedes that the Court should vacate that money judgment [the $2,633,802.50 money judgment] and remand this matter in order to have the district court make more definite factual findings to support a money judgment up to an amount of $2.5 million." Given the district court's finding that the amount of loss was between $1,000,000.00 and $2,500,000.00, this money judgment is clearly erroneous. We vacate the $2,633,802.50 money judgment and remand to the district court for factual findings under Section 853(p)(1) and a revised

figure of up to $2,500,000.00 should the government succeed in meeting its burden under the section.

Salem argues the district erred by failing to rule whether the money seized from Salem's residence should be criminally forfeited and failed to order the return of certain jewelry as the parties had agreed. Specifically, the plea agreement provided that the district court would determine whether money seized from Salem's residence should be criminally forfeited to the United States and also provided that certain pieces of jewelry seized from his residence would be returned after sentencing. "A case becomes moot when the issues presented are no longer 'live' or parties lack a legally cognizable interest in the outcome." *Cleveland Branch, N.A.A.C.P v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (internal quotation marks and citations omitted). On August 17, 2005, the district court granted a default judgment and decree of forfeiture in the civil forfeiture action that covers the money seized from the residence, which renders the argument concerning the money seized from the residence moot. In its brief the government states, "On August 28, 2007, the United States Attorney's Office notified Salem's appellate defense counsel in writing of its willingness to make appropriate arrangements for the immediate return of the requested single item of jewelry seized from Salem's residence as discussed in ¶ 9 of the Plea Agreement." As the parties agree to the return of the item of jewelry, that issue also is moot.

III.

For the foregoing reasons, we affirm the district court's denial of the motion for a mistrial by Younes and Alcharbaji and affirm the sentences of Younes and Abdelsalam but vacate

29

*United States v. Abdelsalam,* 05-4063

Salem's sentence and remand for resentencing.  We affirm the $36,046.30 forfeiture money judgment against Salem but vacate the $2,633,802.50 money judgment against him and remand to the district court to make factual findings and determine the amount of the money judgment in an amount up to $2,500,000.00.